IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| JACQUELINE F. CAREY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 10-413 GMS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

### I. INTRODUCTION

On May 17, 2010, the plaintiff Jacqueline F. Carey ("Carey") filed this action against the defendant Michael J. Astrue, Commissioner of Social Security (the "Commissioner"), for review of the final decision denying her supplemental security income ("SSI") application under title XVI of the Social Security Act.[1] (D.I. 2; D.I. 21 at 5.) Carey brought this civil action under 42 U.S.C. § 405(g) as incorporated by 42 U.S.C. § 1383(c)(3). (*Id.*) For the reasons that follow, the court will deny Carey's motion for summary judgment and grant the Commissioner's cross-motion for summary judgment. The court will affirm the decisions of the Administrative Law Judge ("ALJ") and the Appeals Council.

### II. BACKGROUND

Carey filed an application for SSI on May 30, 2007, alleging disability beginning on June 21, 2005.[2] (D.I. 11 at 9.) Carey's alleged conditions consist of asthma, migraine headaches,

---

[1] Administrative Law Judge Melvin D. Benitz (the "ALJ") issued a written decision denying the plaintiff's claim for disability benefits on November 17, 2008 (the "ALJ's decision"). (D.I. 11 at 9–26.)

[2] Carey was born on October 18, 1978 and was 26 years old at the time of the alleged disability onset date, making her a "younger person" under 20 C.F.R. §§ 404.1563, 416.963 (2011). (*Id.* at 111.)

1

depression, anxiety, bipolar disorder, and attention deficit hyperactivity disorder ("ADHD"). (*Id.* at 12.) Following the denial of Carey's claim both initially and upon reconsideration on March 25, 2008, Carey requested a hearing before the ALJ on April 28, 2008. (*Id.* at 9, 82.) Pursuant to that request, on October 29, 2008, the ALJ held a hearing on Carey's claim. (*Id.* at 9.) At the hearing, the ALJ heard testimony from Carey and from an impartial vocational expert ("VE"), Mitchell A. Schmidt, regarding Carey's claim for SSI.[3] On November 17, 2008, the ALJ issued a written decision denying Carey's claim for SSI. (*Id.*) The ALJ concluded that Carey was not disabled under section 1614(a)(3)(A) of the Social Security Act. (*Id.* at 26.) The Appeals Council denied Carey's request for review without substantive explanation. (*Id.* at 1–5.) On May 17, 2010, Carey filed the instant appeal.

### A. Medical History

#### a. Mental Impairments

During the relevant time period, Carey received treatment and medication from numerous doctors for her mental impairments. (D.I. 11 at 12–17.) She was diagnosed with depression at the age of 14 and has experienced a history of physical and emotional abuse. (*Id.* at 12.) Carey was seen by David Nixon, M.D. from March to May, 2006. During this time, Carey was diagnosed with ADHD, an anxiety disorder, rule out bipolar disorder, and post-traumatic stress disorder. She was assigned Global Assessment of Functioning ("GAF") scores of 60 and 55. (*Id.* at 278, 283.) Dr. Nixon referred Carey to a therapist and prescribed Ritalin and Wellbutrin.[4] (*Id.*) In July of

---

[3] At the hearing, Carey was represented by her attorney, Stephen A. Hampton. (D.I. 11 at 9.)

[4] Carey reported to her therapist on May 10, 2006 that she stopped taking Wellbutrin because she felt like a "zombie" and the medication was hindering her ability to clean. (*Id.* at 12, 272.) On May 17, 2006 Carey reported to Dr. Nixon that she stopped taking the Wellbutrin because it made her irritable, and the Ritalin was not helping. (*Id.* at 270.) Instead, she took Xanax, which was provided by a friend. (*Id.*)

2

2006, after an examination by Abimbola Osunkoya, M.D., Carey was also prescribed Topamax to help with migraine headaches and was warned of migraine triggers. (*Id.* at 333.)

In January and February of 2007, Carey was seen by neurologist Robert Varipapa, M.D., for treatment in response to the migraine headaches she had been experiencing. (*Id.* at 336, 339.) Dr. Varipapa found that the examination was unremarkable and there was no suggestion of intracranial pathology. (*Id.* at 338) He noted that Carey could be experiencing an analgesic rebound due to overuse of over-the-counter medications. (*Id.*) Dr. Varipapa prescribed the medication Elavil, along with twenty minutes of exercise per day and discontinuing consumption of caffeinated beverages.[5] (*Id.*) Carey was also seen periodically from August, 2007 to June, 2008 by Stephen Penny, M.D., who works with Dr. Varipapa.[6] (*Id.* at 341–44, 478.)

Carey was also periodically treated by Gwynn Stup, A.R.N.P., from January of 2007 to July of 2008.[7] (*Id.* at 13–15; 395–99.) Carey admitted during the first examination that she had not taken her prescribed medications from April, 2006 to January, 2007. (*Id.* at 396.) During this first examination, Carey was assigned a GAF score of 40-45. (*Id.* at 399.) Carey was given medication, but in subsequent visits in June and November of 2007 she indicated that she had not been taking her medication for several months. (*Id.* at 453.) Carey again returned to Ms. Stup in January and February of 2008, when she was prescribed Cymbalta and Adderall in addition to her

---

[5] Carey reported that the Elavil was not helping and she had not been exercising because she believed taking care of her child was enough exercise on its own. (D.I. 11 at 339.) Dr. Varipapa declined Carey's request for a prescription of oxycodone, and instead prescribed Lamictal and Prozac, while urging conservative treatments such as lying in a dark, quiet room. (*Id.* at 340.)

[6] Dr. Penny treated Carey's headaches and indicated in his reports that Carey's migraine headaches appeared to be frequent and severe. (*Id.* at 478.)

[7] Under Social Security regulations, Gwynn Stup, who is an advanced practice nurse, is not an acceptable medical source. (20 CFR 404.1513(d); 20 CFR 416.913(d).) The ALJ appropriately considered the factors set forth in SSR 06-03p to determine the weight to assign Ms. Stup's medical opinion, and appropriately concluded that it will be assigned little weight. (D.I. 11 at 22.)

3

existing medication regimen. (*Id.* at 454–55.) After several months of taking her medication, Carey was examined by Ms. Stup in July and August of 2008 and was determined to be fairly stable. (*Id.* at 456.) Carey was assigned a GAF score of 51-60 during this visit. (*Id.*)

On December 8, 2007, Carey underwent a clinical psychological evaluation with Joseph Keyes, Ph.D. (*Id.* at 351.) Dr. Keyes concluded that Carey demonstrated adequate cognitive functioning within normal limits with a disturbance in the attentional process. (*Id.* at 356.) Dr. Keyes assigned Carey a GAF score of 60-65. (*Id.* at 357.) Further, Dr. Keyes estimated a very slight degree of impairment in the competitive labor-market setting. (*Id.* at 352.) He indicated no problems understanding simple instructions or carrying out those instructions under ordinary supervision. (*Id.*) He noted moderate impairment with sustaining work performance and coping with pressures, as well as mild impairment performing routine, repetitive tasks. (*Id.*) The term "moderate" impairment is described by Dr. Keyes' report as "an impairment which affects but does not preclude ability to function." (*Id.*)

During the relevant time period, Carey also attended therapy sessions with Diana Cohen, L.C.S.W. for approximately five months. (*Id.* at 14–15; 461–73.) Ms. Cohen diagnosed Carey with ADHD, bipolar disorder, and migraines. (*Id.* at 464.) During her visits Carey reported to be taking a home schooling high school course and was doing well. (*Id.* at 466.) Carey also described a very close relationship with her daughter and indicated that she was taking her daughter to a nursery program at the church where Carey attended Bible study twice per week. (*Id.* at 467.) Ms. Cohen described Carey as appropriate, controlled, and stable throughout their interactions, and reported improvement from Carey with proper medication. (*Id.* at 461–73.)

4

### b. Physical Impairments

Along with her mental impairments, Carey has also experienced several physical ailments during the relevant time period.

On December 20, 2006, Carey saw Dr. Lewandowski for pain in her knee and right shoulder. (D.I. 11 at 387.) She indicated that she had experienced left knee problems since she was fourteen years old, and her right shoulder had been problematic for several years. (*Id.*) Carey returned to Dr. Lewandowski in January of 2008 with increased shoulder pain, to which she was prescribed pain medication. (*Id.* at 379.) She returned shortly after requesting increased pain medication at which point Dr. Lewandowski advised her to see a pain management physician. (*Id.* at 378.) On September 13, 2007, Carey was examined by Dr. Lakhani for coughing, wheezing, and difficulty breathing. (*Id.* at 402.) She was diagnosed as highly allergenic with moderate persistent asthma, which was complicated by chronic heavy smoking. (*Id.* at 403.) This condition was treated with medication. (*Id.* at 404.) On June 25, 2007, Carey was diagnosed with hyperthyroidism and a palpable goiter. (*Id.* at 418.) Follow-up appointments on October 31, 2007 and January 29, 2008, noted that the hyperthyroidism had significantly improved and required only conservative monitoring. (*Id.* at 419, 422.) Carey also sought pain medication from other physicians to help with muscular problems.[8] Additionally, Carey was previously diagnosed with obesity. (*Id.* at 16, 287.)

---

[8] On December 12, 2007, Carey was examined by Dr. Easter complaining of right hip, ankle, and neck pain, among other ailments. (D.I. 11 at 358.) After the examination was inconclusive, Carey requested pain medication, but Dr. Easter refused because he had no explanation for her groin pain. (*Id.* at 359.) On January 9, 2008, Carey was examined by Dr. Cagampan after experiencing right hip and right shoulder pain. (*Id.* at 413.) Carey noted she had been taking her father's Oxycodone and that it helped with relief. (*Id.*) Dr. Cagampan reported no abnormalities and full range of motion, but diagnosed her with bicipital tendonitis, sprained gluteus medius muscle, and muscle pain. (*Id.* at 415.) She was prescribed Percocet and Skelaxin, and asked to continue with Naproxen. (*Id.*)

5

### B. Hearing Testimony

#### a. Testimony of Jacqueline Carey

At the October 9, 2008 hearing before the ALJ, Carey testified about her past work experience, her home life, and the nature of her claim for SSI. (*Id.* at 29–62.) Carey testified that she worked as a secretary for two years, performing tasks such as answering phones, taking messages, and handling warranty claims. (*Id.* at 30–31.) Carey indicated that she constantly fought with her boss and missed time at work due to her migraines and mental health problems. (*Id.* at 31.) Carey also had two other jobs, one at a Dollar General and the other at a doughnut shop, each of which lasted no longer than three months. (*Id.* at 32–33.) She testified that she has never gotten along with her boss, does not feel comfortable interacting with customers, and does not respond well to criticism from others. (*Id.* at 33–34, 45.) In addition to her problems while at work, Carey explained that she frequently had trouble with transportation to work and simply not wanting to go. (*Id.* at 44.) Carey attributes all of her problems at work to her physical and mental conditions, particularly the ADHD and migraines. (*Id.* at 31–32.)

Carey testified that her health issues became worse following the birth of her daughter, who was born with special needs and was two years old at the time of the ALJ hearing. (*Id.* at 34, 181.) Carey has not worked since the birth of her child. (*Id.* at 34.) Carey stated that the medications she has tried have cut her migraines down from approximately five times per month to approximately three times per month. (*Id.* at 35.) Each migraine she suffers lasts about four days. (*Id.*) Carey explained that her other conditions, such as ADHD and bipolar tendencies, have also gotten worse since her daughter was born, and she frequently experiences mood swings and agitation. (*Id.*) She also described periods of insomnia, during which she may not sleep for days or weeks at a time before crashing. (*Id.* at 36–37) Carey testified that she has suffered through

bouts of depression and anxiety, but has been taking medication to limit their frequency. (*Id.* at 44, 47.)

During the time Carey alleges to be disabled, she reported that she lived with her daughter and her boyfriend. (*Id.* at 141, 280.) At the time of the ALJ hearing Carey was single and lived only with her daughter. (*Id.* at 48.) Carey testified that she spent most of her time taking care of her daughter, completing household chores, and cleaning the house on a daily basis. (*Id.* at 37–39.) Carey also testified that she regularly goes for walks, takes her daughter to the park, and attends social functions approximately once per week. (*Id.* at 39.) Carey attends a parenting class and takes high school home courses but has difficulty paying attention. (*Id.* at 40.) Carey testified that she relies on welfare and currently has no other source of income. (*Id.* at 49.)

### b. Testimony of Vocational Expert, Mitchell Schmidt

The VE offered testimony regarding Carey's background, skills and limitations, and the number of jobs that exist in the national economy that a person of Carey's age, education, and skills may perform. (*Id.* at 52–62.) Specifically, the VE testified that the exertion and skill level of Carey's work as a secretary/accounting clerk is a sedentary, skilled job with a Specific Vocational Preparation ("SVP") of five. (*Id.* at 53.) He testified that Carey's other jobs may not meet the threshold of substantial gainful activity, but that the cashier jobs would be considered light duty, unskilled jobs at SVP level two; the deli slicer job is light duty, unskilled at SVP level two; and the short order cook and waitress jobs would be light duty, semiskilled at SVP level three. (*Id.*) In addition, the VE stated that Carey's prior work required skills that are transferable to other sedentary work of a limited nature. (*Id.* at 54.)

According to the VE, a hypothetical person as described by the ALJ with Carey's residual functional capacity could be employed to numerous positions that are sedentary, unskilled at SVP

7

level two. (*Id.* at 55.) The VE testified that Carey would be able to perform the job requirements of occupations such as an assembler, a garment sorter, an addresser, or a document preparer. (*Id.* at 55–56.) The VE additionally testified that it is his opinion that all of the described positions would allow Carey to sit and stand alternatively on the basis indicated by the ALJ, if needed. (*Id.* at 56.) Upon further questioning, the VE clarified that if the ALJ determined that Carey is unable to get along with coworkers and employers, then most jobs would be precluded. (*Id.* at 58–59.)

### C. ALJ Determination

The ALJ ruled that, in light of all the evidence, Carey was not disabled. Although the ALJ acknowledged that Carey suffered a number of severe impairments—including asthma, migraine headaches, depression, anxiety, bipolar disorder, and ADHD—he concluded that these impairments were not of listing severity; *i.e.*, they were not covered by 20 C.F.R. § 404. (*Id.* at 12–18.) The ALJ also found that Carey's impairments did not preclude her from obtaining light, unskilled sedentary work. (*Id.* at 18.) The VE identified a number of potential jobs that Carey could perform, including assembler, garment sorter, addresser, and document preparer, all of which are available in the national and regional economy. (*Id.* at 24.) The ALJ found that Carey did not qualify for benefits. (*Id.* at 26.)

### III. STANDARD OF REVIEW

#### A. Cross Motions for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). In determining the appropriateness of summary judgment, the court must review the record as a whole and "draw all reasonable inferences in favor of the nonmoving party, [but] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). If the court determines that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hull v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

This standard does not change merely because there are cross-motions for summary judgment. *Appelmans v. Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968) (citation omitted). "The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party." *Krupa v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990) (citation omitted).

### B. Review of an Agency Decision

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992); *see also Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, . . . [the court is] bound by those findings, even if . . . [it] would have decided the factual issue differently."). "Substantial evidence" means more than "a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).) "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (*Id.*) The inquiry is not whether the reviewing court would have made the same determination, but rather, whether the

Commissioner's conclusion was reasonable. *See Brown v. Boweni*, 845 F.2d 1211, 1213 (3d Cir. 1988).

## IV. DISCUSSION

Carey asserts that the ALJ's decision is flawed on two primary grounds. (D.I. 21 at 5.) First, Carey alleges that the ALJ's denial is invalid due to his failure to properly evaluate and weigh the severe impairment of migraine headaches. (*Id.*) Second, Carey argues that the ALJ's hypothetical question to the VE, concerning whether employers would allow Carey to sit and stand alternatively while working, was flawed because the VE testified based upon personal opinion and not based upon any specific resources. (*Id.* at 6.)

### A. Applicable Statute and Law

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382(a)(3)(A). The Commissioner has promulgated regulations for determining disability by application of a five-step sequential analysis. *See* 20 C.F.R. § 404.1520. The ALJ, the reviewing Appeals Council, and the Commissioner evaluate each case according to this five-step process until a finding of "disabled" or "not disabled" is obtained. *See* 20 C.F.R. § 404.1520(a). The process is summarized as follows:

1. If the claimant currently is engaged in substantial gainful employment, she will be found "not disabled."
2. If the claimant does not suffer from a "severe impairment," she will be found "not disabled."
3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 *and* has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled." Otherwise, she will be found "not disabled."
4. If the claimant can still perform work she has done in the past ("past relevant work") despite the severe impairment, she will be found "not disabled."

10

> 5. Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education, and past work experience to determine whether or not she is capable of performing other work in the national economy. If she is incapable, a finding of disability will be entered. Conversely, if the claimant can perform other work, she will be found "not disabled."

*Cunningham v. Apfel*, No. 00-693-GMS, 2001 WL 1568708, at *4 (D. Del. Dec. 7, 2001) (paraphrasing the five-step process for determining disability).

The disability determination analysis involves a shifting burden of proof. *See Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983). In the first four steps of the analysis, the burden is on the claimant to prove every element of his or her claim by a preponderance of the evidence. At step five, however, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment the claimant is able to perform. *See Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000); *see also Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); *Olsen v. Schweiker*, 703 F.2d 751, 753 (3d Cir. 1983). Substantial gainful employment is defined as "work that (a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit." 20 C.F.R. § 404.1510. When determining whether substantial gainful employment is available, the ALJ is not limited to consideration of the claimant's prior work, but may also consider any other substantial gainful activity which exists in the national economy. *See* 42 U.S.C. § 423(d)(1)(A), (2)(A); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

### B. ALJ's Evaluation of Migraine Headaches

Carey alleges that the ALJ's denial of SSI benefits is improper because the ALJ failed to properly evaluate and weigh the severe impairment of migraine headaches. (D.I. 21 at 5–6.) Carey argues that there was significant evidence proving that she would miss so much time from work because of migraines, that it would preclude all employment. (*Id.*) Further, Carey asserts that the

11

ALJ failed to consider her testimony regarding the migraine headaches, despite the fact that the medical records supported her testimony. (*Id.*)

The Commissioner asserts that the ALJ reasonably based his determination on substantial evidence in the record. (D.I. 23 at 6.) Specifically, the Commissioner argues that the evidence demonstrates Carey's failure to seek out treatment on a regular basis, failure to follow doctors' instructions and failure to comply with treatment regimens. (*Id.*) The Commissioner further contends that the ALJ fully addressed all limitations experienced by Carey and found that her testimony regarding the intensity, persistence, and limiting effects of the migraines was inconsistent with the evidence. (*Id.*)

After reviewing the decision of the ALJ in light of the relevant standard of review and applicable legal principles, the court concludes that the ALJ's decision is supported by substantial evidence. In making his decision, the ALJ must consider all relevant evidence and give some reason for discounting the evidence he rejects. *Fargnoli*, 247 F.3d at 41 (ALJ is not expected to reference every related treatment note when record is voluminous, but is expected to consider and evaluate medical evidence consistent with his responsibilities under the law); *Plummer v. Apfel*, 186 F.3d at 429 (3d Cir. 1999) ("The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects."). The ALJ must also consider the claimant's subjective complaints in conjunction with the objective medical evidence, and make a determination as to the credibility of the claimant's testimony. *Fargnoli*, 247 F.3d at 41; *Singleton v. Astrue*, 542 F. Supp. 2d 367, 381 (D. Del. 2008) ("Generally, the A.L.J.'s assessment of a plaintiff's credibility is afforded great deference, because the A.L.J. is in the best position to evaluate the demeanor and attitude of the plaintiff."); *Antoniewicz v. Astrue*, 769 F. Supp. 2d 713, 724 (D. Del. 2011) ("Although allegations of pain and other subjective symptoms must be consistent with objective

medical evidence, the ALJ must still explain why he is rejecting the testimony."); *Pachilis v. Barnhart*, 268 F. Supp. 2d 473, 478 (E.D. Pa. 2003) (the ALJ's decision may not merely disregard the claimant's subjective complaints).

Here, the ALJ's findings indicate that he carefully considered both Carey's testimony and all of the objective medical evidence on the record before coming to his decision. The ALJ considered the severity of the migraine headaches, as evidenced in step two of the sequential process where he found that the migraine headaches Carey suffered from were severe within the meaning of the regulations. (D.I. 11 at 12.) The ALJ also considered Carey's testimony, along with the objective medical evidence, to determine her residual functional capacity. (*Id.* at 18–23.) While her testimony suggested debilitating migraines, the medical records did not. (*Id.*) Specifically, the ALJ considered the frequency of her treatment and noted the intermittent nature of the treatment over the relevant timeframe. The objective medical records support the Commissioner's finding that Carey did not continually seek out medical treatment and in several cases failed to comply with her treatment regimen. (*Id.* at 19–20.) Carey's onset date was June 21, 2005, but the medical records do not indicate any treatment until March 30, 2006, when she sought treatment with Dr. Nixon. (*Id.* at 280.) Carey then pursued treatment only intermittently until January of 2007 when she began to see Dr. Varipapa. (*Id.* at 336.) *See Klangwald v. Comm'r of Soc. Sec.*, 269 F. App'x 202, 205 (3d Cir. 2008) (a claimant's failure to receive medical treatment consistent with severity of claimed symptoms is highly relevant in evaluating credibility).

Moreover, the medical records from Carey's treating doctors demonstrate numerous failures to consistently take medication and follow doctors' treatment regimens. (*Id.* at 20, 270, 272, 339, 478.) The records also indicate that when Carey followed the treatment regimen, the

migraines were better kept under control. (*Id.* at 20, 375.) The ALJ concluded that Carey's testimony regarding the intensity, persistence and limiting effects of the symptoms is not credible to the extent that it is inconsistent with his assessment of her residual functional capacity. (*Id.* at 21.) This conclusion was well reasoned and based on substantial evidence presented in the objective medical records. (*Id.* at 18–21.) The ALJ did not disregard Carey's testimony. Rather, the ALJ came to the conclusion that the testimony was not consistent with the objective medical evidence in the record. (*Id.* at 21.) Therefore, the ALJ's decision regarding Carey's migraine headaches was both reasonable and based on substantial evidence.

### C. Hypothetical Questions Posed to the Vocational Expert

Carey also alleges several flaws in the VE's testimony at the October 9, 2008 hearing in front of the ALJ. (D.I. 21 at 17.) The first deals with a hypothetical question posed to the VE by the ALJ. Carey contends that when describing her impairments, the ALJ failed to include the functional limitations associated with her migraine headaches, and therefore inaccurately characterized them. (*Id.* at 13–14.) The Commissioner alleges that there is no merit to Carey's claim, because the ALJ's hypothetical question was structured based on his findings regarding the level of impairment associated with Carey's migraine headaches. (D.I. 23 at 21–22.)

The validity of a VE's testimony regarding the claimant's ability to perform alternative employment is dependent on the ALJ's accurate portrayal of the claimant's mental and physical impairments as set forth in the hypothetical question. The ALJ's hypothetical does not need to convey every alleged impairment contained in the record, but rather an accurate portrayal of the claimant's impairments that are credibly established by the objective medical records. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (the ALJ is not required to submit every alleged impairment to the VE, but the hypothetical must accurately portray the claimant's impairments);

14

*Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002); *Plummer*, 186 F.3d at 431 (the ALJ must accurately convey to the VE all of the claimant's credibly established impairments).

The ALJ's hypothetical posed to the VE described an individual suffering from migraines and from "headaches somewhat relieved by her medications without significant side effects." (D.I. 11 at 54–55.) This is an accurate portrayal and is credibly established by the objective medical records available to the ALJ. The objective medical records indicate that no treating physician attributed a functional limitation to the migraine headaches from which Carey suffered. The only description of a functional limitation associated with the migraine headaches was Carey's own testimony and subjective description of symptoms. The ALJ appropriately considered Carey's testimony and subjective complaints, and found them inconsistent with assessments of her functional capacity. Therefore, the description of Carey's impairments, as presented in the hypothetical question to the VE, was appropriate.

Carey also alleges that the VE's response to one of the ALJ's questions was flawed because the response was based upon personal opinion, rather than expert opinion. (D.I. 21 at 14–15.) Carey characterizes the VE's testimony on this subject as "simple speculation" that is unsupported by resources or studies. (*Id.*) However, Carey offers inadequate support for this proposition. A VE's opinion does not need to be based on specific journals or studies, and as long as it is within his capacity as an expert, he may opine on what jobs can be performed by individuals with limited abilities. *McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014) ("[V]ocational expert may be consulted to determine whether there is other work in the national economy that an individual with the ability to do less than the full range of sedentary work may perform."); *Davie v. Sec'y of Health & Human Servs.*, 866 F.2d 431 (6th Cir. 1989) ("The VE's testimony need not be based on journals or other documentary evidence but is indeed based on the VE's personal expertise.")

Here, the VE did not cite to specific resources or studies offering support for his position, but it was based on his personal knowledge as an undisputed expert in the field. As a result, his testimony was appropriately relied upon by the ALJ.

## V.  CONCLUSION

For the foregoing reasons, the court will (1) grant the defendant's cross motion for summary judgment, (2) deny the plaintiff's motion for summary judgment, and (3) affirm the ALJ's decision.

Dated: March 3̶0̶, 2015

_____
UNITED STATES DISTRICT JUDGE